**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SARAH JANE BROOKS, Widow of
Clyde M. Brooks,
Petitioner,

v.

No. 95-1121

W. P. COAL COMPANY; DIRECTOR,
OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,
Respondents.

On Petition for Review of an Order
of the Benefits Review Board.
(93-0274-BLA)

Submitted: October 3, 1995

Decided: April 4, 1997

Before WILKINSON, Chief Judge, and HALL and
WILLIAMS, Circuit Judges.

_____

Vacated and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

Sarah Jane Brooks, Petitioner Pro Se. Konstantine Keian Weld,
OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA,
Charleston, West Virginia; Patricia May Nece, Sarah Marie Hurley,
UNITED STATES DEPARTMENT OF LABOR, Washington, D.C.,
for Respondents.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Sarah Jane Brooks, the widow of Clyde Brooks, petitions for review of an order of the Department of Labor's Benefits Review Board (BRB) affirming the denial of her claim for survivor's benefits under the Black Lung Benefits Act, 30 U.S.C. §§ 901-945. Because the administrative law judge's analysis fails to take into full account an evidentiary concession made by the respondent operator, we are unable to discern whether the decision rests on substantial evidence. Accordingly, we remand the claim for reconsideration.

I.

Clyde Brooks labored in the Nation's coal mines for 41 of his 61 years. In addition to coal dust, his lungs were subjected to cigarette smoking (two packs per day) for fourteen years (1946 through 1960). In 1975, based on a finding that he suffered from occupational pneumoconiosis, he received a twenty percent permanent disability award under West Virginia's worker's compensation system. On February 29, 1988, at the age of sixty, he suffered a heart attack, which necessitated bypass surgery and ended his working days. He filed a claim for federal black lung benefits, but it was denied in March 1989 because he failed to prove that he was totally disabled by the disease.

On November 26, 1989, at Myrtle Beach, South Carolina, Brooks developed acute respiratory failure. He was hospitalized there, and was later transferred to the care of his treating physician, Dr. Crotty, in Charleston, West Virginia.

Dr. Crotty's admission diagnoses were coronary disease, coal worker's pneumoconiosis, pulmonary fibrosis, and rheumatoid arthritis. Brooks went into cardiopulmonary arrest on November 30, 1989; he was resuscitated, but his condition was hopeless. Upon learning

2

that he suffered from irreversible right-side heart failure, his family requested that he not be resuscitated again. Brooks succumbed on December 17, 1989. Dr. Crotty listed the immediate cause of death as cardiopulmonary arrest, caused in turn by pneumonia, pulmonary fibrosis, and rheumatoid arthritis.

An autopsy was performed by Dr. Cuadra. He diagnosed (i) severe, diffuse bronchopneumonia of both lungs, with severe bronchiectasis and empyema of the right lung; (ii) focal interstitial fibrosis, emphysema, and fibrosing alveolitis; (iii) simple coal workers' pneumoconiosis with emphysema; (iv) severe fibrosis of the right pleura; (v) status post coronary artery bypass surgery for severe coronary artery disease; (vi) old myocardial infarction of the posterolateral wall of the left ventricle; and (vii) generalized visceral congestion as the terminal event.

Brooks' widow then filed this claim for survivor's benefits under the Black Lung Benefits Act. A hearing on the claim was held before an administrative law judge (ALJ). At the outset of this hearing, the respondent operator conceded the presence of "pneumoconiosis" as defined by the Act and implementing regulations.

All x-rays that were admitted were positive for simple pneumoconiosis, and, as we noted above, Dr. Cuadra's autopsy also found the disease present. On the other hand, Dr. Zaldivar and Dr. Fino criticized the autopsy's finding of pneumoconiosis. Dr. Zaldivar stated:

> The pathologist did not describe any findings compatible with CWP [coal worker's pneumoconiosis][;] therefore there is no indication in the microscopic examination that CWP is present at all. The term anthracosis means black pigment which in itself is not specific for coal[worker's] pneumoconiosis. There is no description of macules. Apparently rheumatoid arthritis was present. It can produce pulmonary fibrosis and bronchiectasis. The diagnosis of <u>emphysema</u> apparently was made from the gross tissue and not microscopic exam. The emphysema was described as multifocal, i.e. patchy [and] not to be confused with the focal emphysema surrounding macules in CWP.

3

This report should be sent back to the pathologist for clarification. As it stands there is no tissue evidence of CWP and therefore no contribution of CWP to death. Death was caused by pneumonia, pulmonary fibrosis and empyema and bronchiectasis all unrelated to coal workers pneumoconiosis.

Dr. Fino sounded a similar theme. He conceded that Dr. Cuadra had described "anthracosis" and that anthracosis"is a deposition of carbon or coal dust within the lungs," but, like Dr. Zaldivar, he was insistent on the presence of coal macules for a diagnosis of pneumoconiosis (emphasis added):

> [Anthracosis] is not synonymous with the diagnosis of coal workers' pneumoconiosis. In fact, to make a diagnosis of coal workers' pneumoconiosis, one <u>must</u> have coal dust pigment engulfed by microphages surrounded by perifocal emphysema and fibrosis. <u>The lesion that is necessary for the diagnosis of coal workers' pneumoconiosis is the coal macule</u>.

From this finding, Dr. Fino could only conclude that"coal workers' pneumoconiosis" did not contribute to Brooks' death. He did, however, also give an alternative opinion that the disease, even if present in the degree noted by the autopsy, would not have hastened death.

The ALJ denied benefits, finding that Mrs. Brooks had failed to establish that pneumoconiosis hastened her husband's death. The BRB affirmed, and Mrs. Brooks petitioned this court for review.

II.

To be entitled to survivor's benefits, Mrs. Brooks must show that her husband's death was "due to pneumoconiosis." This circuit has approved the Director's interpretation of the statute and its implementing regulation,**1** which requires the claimant to prove that "pneumoconiosis" as defined by the Act actually hastened death in any

_____

**1** 20 C.F.R. § 718.205(c).

4

way. Shuff v. Cedar Coal Co., 967 F.2d 977, 979-980 (4th Cir. 1992), cert. denied, 506 U.S. 1050 (1993). We must affirm the decision of the ALJ if it is in accordance with law and is supported by substantial evidence. Amigo Smokeless Coal Co. v. Director, OWCP, 642 F.2d 68 (4th Cir. 1981).

Experience has shown that Congress chose poorly when it picked the word "pneumoconiosis" to denote the broad class of pulmonary afflictions for which it intended to provide benefits. "Pneumoconiosis" is a word that was already taken, and, moreover, taken by the very expert witnesses -- physicians and radiologists -- on which the claims resolution process relies. In insisting upon the presence of coal macules for a diagnosis of "pneumoconiosis," Drs. Fino and Zaldivar used the term in the sense natural to them as clinicians.

Unfortunately, use of only the clinical sense of the word leaves much unaddressed, because Congress defined "pneumoconiosis" as a broad set of diseases, bound together not by a common pathology but rather by a common cause: exposure to coal dust. 30 U.S.C. § 902(b). The current version of the legal definition is found at 20 C.F.R. § 718.201:

> For the purpose of the Act, pneumoconiosis means a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment. This definition includes, but is not limited to, coal workers' pneumoconiosis, anthracosilicosis, anthracosis, anthrosilicosis, massive pulmonary fibrosis, progressive massive fibrosis, silicosis or silicotuberculosis, arising out of coal mine employment. For purposes of this definition, a disease "arising out of coal mine employment" includes any chronic pulmonary disease resulting in respiratory or pulmonary impairment significantly related to, or substantially aggravated by, dust exposure in coal mine employment.

Thus, while the opinions of Drs. Fino and Zaldivar may well be correct as a matter of medicine, they are not necessarily so as a matter of law. Obviously, "anthracosis" -- mentioned by name in the regulation -- is "pneumoconiosis" if it results in respiratory or pulmonary

5

impairment and is "significantly related to[ ] or substantially aggravated by" coal dust exposure. See Barber v. Director, OWCP, 43 F.3d 899, 900-901 (4th Cir. 1995) (Legal definition of pneumoconiosis applies to "every instance the word is used in the statute and regulations"; autopsy finding of "no typical coal-worker's macules" did not defeat claim.)

Though the ALJ acknowledged the breadth of the legal definition in her opinion, there is an additional wrinkle here: the respondent stipulated that "legal" pneumoconiosis was present. This stipulation begs two questions, unaddressed and therefore unanswered below: (i) Which of Brooks' pulmonary afflictions is or are conceded to meet the legal definition? (ii) Did this affliction or afflictions actually hasten Brooks' death?

Without answers to these questions, the record and the ALJ's reasoning are ambiguous, and we cannot determine whether the denial of benefits is supported by substantial evidence. **2** Accordingly, we will remand the claim to the BRB with instructions for a further remand to the ALJ.

The denial of benefits is vacated, and the claim is remanded for reconsideration in accordance with this opinion.

VACATED AND REMANDED

_____

**2** Recently, in Richardson v. Director, OWCP, 94 F.3d 164, 166 n.2 (4th Cir. 1996), we observed (citations omitted):

> Much confusion . . . stems from the failure of counsel and witnesses to specify, when they use the term "pneumoconiosis," whether they are referring to legal or clinical pneumoconiosis, and from the failure of the ALJ to resolve the conflict when this ambiguity arises in the record. To make an accurate assessment of whether the ALJ's decision is supported by substantial evidence, the litigants and the ALJ alike must cooperate to provide a record free from this ambiguity. As we have observed, clinical pneumoconiosis is only a small subset of the compensable afflictions that fall within the definition of legal pneumoconiosis under the Act.

6